# CHARLESTON.

FIRST NATIONAL BANK OF WELCH, *Adm'r.* v. E. L. BAILEY.

Submitted May 29, 1924. Decided June 24, 1924.

ACTION—*Where Stock Wrongfully Taken Benefited Defendant's Estate, Plaintiff May Waive Tort and Recover Value in Assumpsit.*

Where plaintiff's shares of stock in a corporation are wrongfully taken by defendant under claim of right and converted to defendant's own use, whereby defendant's estate is benefited, plaintiff may waive the tort and recover in assumpsit the value of the stock.

McGINNIS, JUDGE, absent.

Error to Circuit Court, Mercer County.

Action by the First National Bank of Welch, administrator, against E. L. Bailey. Judgment for defendant, and plaintiff brings error.

*Reversed and rendered.*

*Strother, Sale, Curd & Tucker,* for plaintiff in error.
*Sanders, Crockett & Fox,* for defendant in error.

MEREDITH, PRESIDENT:

The First National Bank of Welch, as administrator of the estate of E. H. Sudduth, deceased, brought its action in assumpsit for the recovery of $50,000.00 from E. L. Bailey. The declaration contains the common counts and also a special count seeking recovery for the value of certain stocks transferred to defendant by decedent. The case was tried by the court in lieu of a jury and resulted in a judgment for plaintiff in the sum of $12,123.33. Plaintiff, claiming that upon the evidence adduced it is entitled to more than $30,000, obtained a writ of error.

For many years prior to the death of E. H. Sudduth, which occurred in November, 1922, he and the defendant had been jointly interested in various enterprises. Some of these were managed by the one, and others by the other. They reposed the utmost confidence in each other. One of these enterprises was the Williamson Coal & Coke Company, which for brevity will hereafter be called the Williamson Company. It was capitalized at $50,000.00; all its stock, except shares for the qualification of directors, was held by Sudduth and Bailey in equal portions. They may properly be treated as equal and sole owners, as there had been issued to each 248½ shares. The company was engaged in the coal mining business and had a large acreage under coal mining leases in Mingo County under operation. In 1917 defendant obtained certain options or contracts of lease on certain tracts of coal lands in Pike County, Kentucky; he caused to be organized for the purpose of taking over and operating these Pike County properties two other corporations, the Sudduth Coal Company, hereafter called the Sudduth Company, and the Bailey Coal Company, hereafter called the Bailey Company. Bailey invited Sudduth into both new companies. It was not the intention of either party to put much money individually into either of them, but it was understood between Bailey and Sudduth that they would use whatever funds of the Williamson Company that could be spared in building up and equipping the two new mines of the Sudduth Company and the Bailey Company. Upon this understanding 200 shares of the stock in the Bailey Company and 200 shares of the stock in

the Sudduth Company were issued to Bailey, the defendant; 100 shares in each of the two companies were issued to Sudduth. Neither, so far as the record shows, paid any money into the treasury therefor. These two companies proceeded to make considerable expenditures on their respective properties, but largely from advancements made by the Williamson Company, though there were some shares of stock in each company sold to outsiders. As a result, the two companies owed the Williamson Company over $60,000. The Sudduth Company and the Bailey Company were originally incorporated for $50,000 each. Bailey and Sudduth agreed in March, 1919, to increase the capital stock of each company to $100,000. It will be recalled that Bailey held 40% and Sudduth 20% of the original issue and it was understood as was their legal right, that each of them could subscribe to the new issue in the same proportions. This was not done by either, though some shares were sold to other persons. On the contrary, at the instance of Bailey, there was issued to the Williamson Company 300-shares of the capital stock in the Sudduth Company and 300 shares in the Bailey Company, in payment of the $60,000 debt for moneys advanced. The Williamson Company appears to have also acquired from time to time other shares in the Sudduth Company and the Bailey Company which certain subscribers had failed to take up. On April 19, 1920, it was decided that the affairs of all three of these companies should be put in process of liquidation by means of various transfers to be made as of May 1, 1920. This action was taken at stockholders' meetings of each of the companies. Carrying out the resolution then adopted, the Williamson Company conveyed to Williamson Fuel Company all its property except stocks and bonds of other corporations, bills receivable, claims for damage, merchandise and powder, for $150,000, of which $100,000 was paid cash and the balance was evidenced by a note at four months. As of the same date it sold to Williamson Fuel Company, under separate agreement, its merchandise and powder. On that day it was resolved to dissolve the corporation and to transfer all its assets to R. L. Bailey, as agent or trustee, with power to collect and distribute the proceeds among the Williamson

Company's stockholders in proportion to their holdings of stock.

We are not concerned in this inquiry about the stock held by outsiders. From March, 1919, to the spring or summer of 1921, the stock in the Sudduth Company and in the Bailey Company, so far as it concerns the litigants, stood on the books as follows: Bailey, 200 shares, Sudduth, 100 shares, and Williamson Company, 300 shares in each of the two companies. On April 19, 1920, the Sudduth Company and the Bailey Company in pursuance of a general plan also voted to liquidate their affairs as of May 1, 1920, and on that date sub-let their respective properties, each receiving $50,000 in cash and royalties at 50 cents per ton payable monthly. These royalties which appear to have been paid regularly amount to large sums, and continue over considerable periods. Both companies, on June 30, 1920, resolved to dissolve, and caused all their assets to be transferred to R. L. Bailey as agent or trustee with authority to collect and disburse the same, after payment of debts, to the then stockholders in proportion to their holdings. Thus all three of the companies were dissolved, their charters surrendered, the shares of stock in each company delivered to R. L. Bailey, secretary and treasurer of each company, and cancelled. Among the certificates so delivered were certificate No. 22 for 50 shares in the Bailey Company, and certificate No. 5 for 50 shares in the Sudduth Company, both issued to E. H. Sudduth September 18, 1917. These two certificates form the basis of the present controversy.

Following the transfer of the assets in the three companies to R. L. Bailey as collecting and disbursing agent he proceeded to carry out his trust; he received large sums owing to each of the three companies, paid off the debts and made certain disbursements to the respective stockholders. He seems faithfully to have performed his duties and no complaint is made on that score.

In the early summer, 1921, R. L. Bailey asked Walton Sudduth, a son of E. H. Sudduth, to go with him and E. L. Bailey to see E. H. Sudduth, who was then living on his farm at Falls Mill, Virginia. The party drove over, R. L. Bailey taking with him the two certificates of stock above

mentioned, which E. H. Sudduth had turned in for cancellation. The object of the visit was to have Sudduth transfer to E. L. Bailey a part of his shares of stock in the Bailey Company and in the Sudduth Company so that the holdings therein as between Bailey and Sudduth should be so distributed as to give Bailey 40% or 400 shares in the aggregate and Sudduth 20% or 200 shares in the aggregate; the excuse at this particular time was that the debts of the two companies had been paid out of the sales made and royalties accrued and paid and R. L. Bailey wanted to settle the basis of distribution of the royalties which were then accumulating. E. L. Bailey claimed that he was entitled to more than what stood in his name on the companies' books. At the time the three companies were dissolved and their assets were transferred to R. L. Bailey for distribution, the stocks as between the present litigants stood as follows:

In Williamson Coal & Coke Company:
    E. L. Bailey    50%.
    E. H. Sudduth 50%.
In Sudduth Company:
    E. L. Bailey             200 shares.
    E. H. Sudduth            100 shares.
    Williamson C. & C. Co. 343 shares.
In Bailey Company:
    E. L. Bailey             200 shares.
    E. H. Sudduth            100 shares.
    Williamson C. & C. Co. 327 shares.

According to the resolutions adopted, R. L. Bailey was to distribute the various dividends to the stockholders according to their respective shares. It will be recalled that 300 shares in each of the two latter companies had been issued to the Williamson Company in payment of its advancements to them. If the dividends from the other two were paid on these shares to the Williamson Company and then by it paid to its stockholders, Bailey and Sudduth would each get half. This would effect the same result as if Bailey had 350 shares in the Bailey Company and 350 shares in the Sudduth Company; and Sudduth 250 shares in each of the two companies.

But E. L. Bailey claimed that that was not fair to him; that he was entitled to subscribe to the new or increased capital stock in the two companies so that his holdings would be twice as much as Sudduth's, that is, he should have 200 shares more in each and Sudduth 100 more in each, making their holdings in each company respectively 400 shares and 200 shares. He and Sudduth made no subscriptions to the increased capital; but in part in order to avoid payment of income taxes by Williamson Company, Bailey had that company accept the issue of 300 shares each in the Bailey and Sudduth Companies, in cancellation of its claim for advancements. But of this $60,000 debt going to the Williamson Company upon distribution of its assets Bailey and Sudduth would each have received half; hence Sudduth's representative claims each should receive half of the dividends which may be paid upon the 300 shares of stock in each of the two companies which were issued in payment of the debt.

In order to have the matter adjusted, R. L. Bailey took the two certificates mentioned when he, E. F. Bailey and Walton Sudduth went to see E. H. Sudduth. As a result of that meeting E. H. Sudduth signed transfers of the two certificates in blank and delivered them to R. L. Bailey, who later filled out the blanks in the name of E. L. Bailey as transferee, dating them back to May 1, 1920. It is claimed by defendant that he then agreed to pay Sudduth $10,000 in cash with interest as a consideration. This was not paid when this suit was brought and it is for that amount with interest unpaid that the judgment was rendered. Defendant does not dispute the amount. Plaintiff claims recovery for the full value of these shares, 50 in each of the new companies, which would be about $30,000, upon the ground that Sudduth did not understand the nature of the transaction and did not intend to sell these shares to Bailey. This is a fact found by the circuit court in its opinion, and we are inclined to the view that Sudduth did not understand it, did not intend to sell his shares to Bailey, but thought R. L. Bailey as agent needed his signature thereto in order to adjust the books. We do not mean to say that the Baileys fraudulently induced Sudduth to sign; but Sudduth was in ill health, the matters were complicated and we do not wonder that he did not understand.

After carefully studying the record and giving full consideration to oral argument of counsel and their voluminous and able briefs, we are not sure that we have made or can make the matter plain. Sudduth and Bailey were fast friends and had been such for many years. The result here is not the result of dishonesty or double dealing, but grows out of an honest difference between the parties as to their relative legal rights. The trial court found that Sudduth did not intend to sell these shares to Bailey; that the minds of the parties did not meet; that Sudduth did not understand the object of signing the transfers of the certificates. He probably thought that the matter would be adjusted in proper time. The defendant can not and does not say that Sudduth understood it; R. L. Bailey could only say that Sudduth said he understood, not that he actually did understand. Before he died he told all of them that he did not understand it,—in fact, repudiated it. Such being the case, these transfers, signed in blank, later filled out in the defendant's name, dated back a year or more, ought not to bind decedent's estate, since no innocent third party's rights have intervened, nor has the defendant been misled or in any wise prejudiced. So we may ignore this supposed sale at $10,000; no price was stipulated in writing. There was not, as the circuit court found, any sale at any price.

But the court found the defendant was entitled to the shares represented by these certificates, or a like number of like shares out of that held by the Williamson Company, in order to make his holdings in each of the two companies 400 shares and Sudduth's 200, upon the payment by him to Sudduth's estate of the sum of $10,000. If so, the judgment rendered is correct; if not, it is wrong. Let us examine it from that angle. R. L. Bailey, a nephew of and witness for defendant, was the secretary-treasurer of all of these companies and was probably more familiar with the matter than any one else. He explains the increase in the stock, and the issue thereof to the Williamson Company as follows:

"One of the main objects of increasing the stock was to reduce our net income on our income tax returns. In other words, it gave us more exemption, I don't remember now just how much. Mr.

Sudduth asked the question as to how the stockholders were going to pay for their stock, and I told him the companies, Sudduth and Bailey, owed the Williamson Coal & Coke Company enough money to take up his and Captain Bailey's stock, and then he asked how I was fixed personally, and I told him they also owed me enough to pay for my stock. Mr. Sudduth agreed to this, and we had Mr. Stokes dictate the notice of the meeting and prepare the minutes and apply for this increase, and when we got the authority to increase this capital stock, I think it was along in April, my idea was to let the two companies, Sudduth and Bailey, pay the Williamson Coal & Coke Company $60,000 of the money that the Williamson Coal & Coke Company had loaned them, and the Williamson Coal & Coke Company, in turn, pay Capt. Bailey and Mr. Sudduth $30,000 each, which would go to them in the form of a dividend, and then they could use the same money to pay for their stock which money would eventually go back into the treasuries of the two companies. I thought that matter over and knew if the Williamson Coal & Coke Company would pay them $30,000 each, that would necessitate Mr. Sudduth and Mr. Bailey each paying a large income tax on their $30,000 dividend, I discussed that with E. L. Bailey and told him that is what he would have to do, he would have to pay a big income tax if that dividend was issued by the Williamson Coal & Coke Company, and I suggested to him that instead of doing that, just let the Sudduth Company and the Bailey Company issue $30,000 each of their stock to the Williamson Coal & Coke Company and charge it up to them on their books, which would be the amount of stock that he and Mr. Sudduth were entitled to, out of the increased stock. After that was done, and the stock was issued to the Williamson Coal & Coke Company, he made the statement—before that was done, that it was all right with him provided he, E. L. Bailey, got his prorata part of the stock. And I told him I thought there would be no trouble about that, that was my understanding of the matter, that he was to get his proportion in the same proportion he had formerly held, and the stock was issued in that way, and when the Sudduth and Bailey companies leased

their properties in 1920 and the Williamson Coal & Coke Company sold its property, I then told E: L. Bailey he had better make some settlement of the $20,000 that he owed the Williamson Coal & Coke Company and take out his stock, and I got to figuring on that proposition, and saw that if he were to pay $20,000 into the treasury of the Williamson Coal & Coke Company and take out the $20,000 worth of stock he was entitled to, that he, in turn, would have to be paid $10,000 of that money back by the Williamson Coal & Coke Company and Mr. Sudduth would be paid $10,000 of it, which would throw them in again for an income of $10,000 which they would have to pay tax on. The affairs of the Williamson Coal & Coke Company when we closed them in 1920, showed a loss of around $70,000 to the stockholders and we practically closed out the affairs of the Williamson Coal & Coke Company, and had to set up that loss in that year in making our income tax returns, and they each took advantage of that $35,000 loss in making their personal returns. If this $20,000 he had paid into the Williamson Coal & Coke Company, or owed the Williamson Coal & Coke Company for his stock would have been paid directly to the Williamson Coal & Coke Company, then they would have had to disburse that $20,000 equally between them, or $10,000 each, and they would have both had to report that $10,000 as an income, and pay a pretty heavy tax on that. I discussed that with E. L. Bailey and he asked me how I thought we could settle it. I said I thought we could settle it in this way, that instead of paying any thing at all into the Williamson Coal & Coke Company, not to do that, but for him to pay Mr. Sudduth $10,000 direct, and let Mr. Sudduth transfer 100 shares of stock to him, which would be the same as he would get if he went into the Williamson Coal & Coke Company.''

It is quite probable that Bailey would not have voted for any increase in the capital stock had he had no right to subscribe for the new stock in proportion to his holdings. But he did not subscribe. Had he done so, he would, under the law, have been compelled to pay for his new stock, just as any other subscriber. Some of the new issue was sold to

others, but none to Bailey or Sudduth. The companies were largely indebted and this was the real reason for the increase. It does not appear at what price the new stock was sold, but probably it was sold at par. Instead of Bailey and Sudduth buying in their own names, putting up their own money individually as was contemplated, Bailey paid the Williamson Company's debt by causing the 300 shares in each company to be transferred to it. It is quite probable that Sudduth knew nothing of this when it was done; but it certainly can not be true that he knew nothing of it later, when the companies decided to dissolve, because he was a director in all the companies, was present at meetings when the holding of stocks was reported, monthly reports were made to him, and it can hardly be believed that he was ignorant of the transaction during the three years preceding his death. We find no evidence tending to show that the matter was concealed from him by his associates and there was no reason for any concealment. Now Bailey claims that the Williamson Company merely took this stock as trustee for him and Sudduth in the proportion of two to one. But that can not be. That debt was either paid or not paid. Both R. L. Bailey and E. L. Bailey say it was paid. This stock was treated as payment of the debt. It became the stock of the Williamson Company. At that time it was not worth as much as it was later. Had it declined in value or not increased in value, there would probably have been no question raised. This stock being the absolute property of the Williamson Company, and Bailey and Sudduth being equal shareholders in that company, it necessarily follows that each had equal rights in the assets of that company; so each, upon the distribution of the Williamson Company's holdings would be entitled to 50% of the dividends derived from the shares going to it from the Bailey Company and the Sudduth Company stock, or a like proportion of the assets, whatever their form, should they be divided in kind. Hence the defendant is not entitled to a transfer of any of the shares held by the Williamson Company, upon paying Sudduth $10,000 for the purpose of increasing his holdings. Those shares belong to Williamson Company, not to its stockholders; but the two stockholders, the plaintiff and defendant, have equal rights

in the proceeds.   Even though there was an understanding
between Bailey and Sudduth that each was to share in the
new issue in proportion to their former holdings, this was
never carried out; such right was waived by the sale to the
Williamson Company.

Having disposed of defendant's claim that he was entitled
to make up his supposed deficiency in shares out of those held
by the Williamson Company, and there being no valid sale
of Sudduth's shares represented by the two certificates of
50 shares each, it follows that Bailey was not and is not en-
titled to them.

Such in effect was the finding of the trial court.   In the
order entered the trial judge says:

> "I am satisfied from the evidence in the case
> that at the Falls Mills conference, the time at
> which Mr. Sudduth assigned to E. L. Bailey the
> 100 shares of stock of the original issue of the
> Bailey and Sudduth Companies, Mr. Sudduth did
> not understand the transaction, but having full
> confidence and faith in Capt. Bailey, he assigned
> the stock to him, with the understanding that at a
> future date they would go over the matter and
> have a full explanation in regard to the transac-
> tion.   It was never his intention to sell this 100
> shares of stock to E. L. Bailey, and it is my opin-
> ion that you can not sue at law for the value of
> this stock.   At the time of the sale of the Wil-
> liamson Coal Company, and the leases of the Sud-
> duth and Bailey Companies to other persons, there
> was an understanding that Sudduth and Bailey
> would have paid to them from the sale and leases
> such amounts from the sale and royalties from the
> leases as was represented by their stockholdings."

He then concludes that Sudduth or his administrator could
not sue at law for the value of these 100 shares; that an
action at law could be maintained for the dividends received
thereon, but not for the value of the stock, which would cover
future dividends. In this we think the court erred.   Defend-
ant's taking these shares and appropriating them to his own
use under the circumstances was a legal wrong,—a tort.   He
holds property to which he is not entitled.   He has converted
it to his own use; received dividends upon it, taken benefits

to his estate. Therefore, plaintiff could waive the tort and sue in assumpsit for the value of the property so appropriated. It was held in *Walker* v. *N. & W. Ry. Co.*, 67 W. Va.. 273, 67 S. E. 722, that "If a railroad company, without the knowledge or consent of the owner, takes the property of a contractor, left stored temporarily on its right of way, and appropriates the same to its own use in a manner indicating a claim of right in opposition to that of the owner, the latter may waive the tort and recover the value of the property taken in any action of assumpsit." There are many authorities to the same effect. *Wilson* v. *Shrader*, 73 W. Va. 105, 79 S. E. 1083, Ann. Cas. 1916-D, p. 886; *McDonald* v. *Peacemaker*, 5 W. Va. 439; *Maloney* v. *Barr*, 27 W. Va. 381; *Burke* v. *Nutter*, 79 W. Va. 743, 91 S. E. 812; *Parkersburg & Marietta Sand Co.* v. *Smith*, 76 W. Va. 246, 85 S. E. 516; Kittle, Modern Law of Assumpsit, §76. Under this firmly established rule, plaintiff has the right to recover the value of the stock appropriated by defendant.

The final point is to determine that value. R. L. Bailey testified that upon making the sub-leases by the Bailey Company and the Sudduth Company, the Bailey Company stock had a maximum value of $170.00 per share and a minimum value of $150.00 per share and that of the Sudduth Company a maximum value of $390.00 and a minimum value of $350.00 per share. Of course, their future value depends to some extent upon whether the sub-lessees carry out their contracts by paying the large monthly royalties, but there is nothing to indicate any failure in that respect, but rather the contrary. The difference between the maximum and minimum values is estimated upon contingencies, and especially with reference to whether the federal income taxes as heretofore reported will be allowed to stand. The minimum value of the 100 shares represented by the stock certificates is thus fixed at $25,000; the maximum at $28,000. We are inclined to give the defendant the benefit of any doubt and hold that the value as shown by the evidence, at the time of the conversion of the stock by him, was $25,000. Sudduth was paid $625.00, May 31, 1921. The date of the delivery of the stock is not definitely fixed, but it was probably in May, 1921. Calculating the interest from June 1, 1921, to the present date,

June 16, 1924, we find the principal and interest amount to $29,562.50; deducting therefrom the $625.00 paid, there is a balance of $28,937.50, for which judgment will be entered here.

We therefore reverse the judgment of the circuit court and enter judgment for the amount above stated.

*Reversed and rendered.*